UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------X
STEPHEN SCOTT LAVALLE,

                 Petitioner,           <u>MEMORANDUM & ORDER</u>
                                            06-CV-2538 (JS)

      -against-

DALE ARTUS, Superintendent,
Clinton Correctional Facility,

                  Respondent.
-----------------------------------X
APPEARANCES
For Petitioner:      Richard Ware Levitt, Esq.
                    Law Offices of Richard Ware Levitt
                    148 E. 78th Street
                    New York, NY 10021

For Respondent:      Michael Miller, Esq.
                    Suffolk County District Attorney's Office
                    Criminal Courts Building
                    200 Center Drive
                    Riverhead, NY 11901

SEYBERT, District Judge:

## INTRODUCTION

       Petitioner Stephen Scott LaValle ("LaValle" or "Petitioner") seeks a writ of habeas corpus under 28 U.S.C. § 2254. For the reasons below, LaValle's petition for a writ of habeas corpus is DENIED.

## BACKGROUND

I.   <u>Procedural History</u>

       On July 17, 1999, Petitioner was found guilty of murder in the first degree. Thereafter, a Suffolk County jury sentenced Petitioner to death. The judgment of conviction and sentence were entered in the Supreme Court, Suffolk County (Mullen, J.) on

September 13, 1999.

Petitioner appealed his death sentence directly to the Court of Appeals for the State of New York. On appeal, Petitioner presented twenty-four claims of error including: (1) the prosecution failed to turn over Brady material and (2) the trial court erred when it failed to grant Petitioner's request to represent himself. People v. LaValle, 3 N.Y.3d 88, 817 N.E.2d 341, 783 N.Y.S.2d 485 (2004).

On June 24, 2004, the Court of Appeals affirmed Petitioner's judgment of conviction; however, the court found that the deadlock jury instruction given was unconstitutional. The Court thus overturned Petitioner's death sentence and remitted the case to the trial court for re-sentencing. LaValle, 3 N.Y.3d 88, 817 N.E.2d 341, 783 N.Y.S.2d 485. On August 9, 2004, Petitioner was re-sentenced to life imprisonment without the possibility of parole. Petitioner appealed and on August 24, 2006, the Appellate Division, Second Department affirmed the sentence. People v. LaValle, 28 A.D.3d 494 (N.Y. App. Div. 2006). The Court of Appeals denied leave to appeal on April 27, 2006. People v. LaValle, 6 N.Y.3d 849, 849 N.E.2d 978, 816 N.Y.S.2d 755 (2006).

On May 23, 2006, Petitioner filed a petition for a writ of habeas corpus. In his petition, Petitioner raises two grounds. Petitioner again asserts that the trial court deprived him of his right to represent himself, and that the prosecution concealed

exculpatory material in violation of Petitioner's <u>Brady</u> rights.
See <u>Brady v Maryland</u>, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215
(1963).

II.  <u>Factual Background</u>

At approximately 6:30 a.m., on May 31, 1997, Petitioner
raped and murdered Cynthia Quinn ("Quinn"), a schoolteacher at the
Patchogue-Medford High School, located in Suffolk County, New York.
Quinn left her home approximately a half-hour earlier for her
routine morning jog.  When Quinn had not returned by 7:30 a.m., her
husband, Brian Quinn ("Brian"), became concerned because he
expected her to return by 7:00 a.m. to watch their children while
he left for work.  Brian was also aware that Quinn had a track meet
later that morning.  After unsuccessfully searching the surrounding
area for Quinn, Brian called the Fire Chief of the Yaphank Fire
Department.  Brian and the Yaphank Fire Department engaged in a
thorough search for Quinn.

The search intensified with the Suffolk County Police
Department and Brookhaven Code Enforcement joining the Yaphank Fire
Department.  At approximately 12:30 p.m., two of the volunteer
firefighters walking along Mill Road in Suffolk County spotted
bright colors about fifty to seventy-five feet into the woods and
realized that it was Quinn.  Quinn's torso, neck, and arms were
covered with seventy-three stab wounds made with a screwdriver-like
instrument.  She had a broken rib, bruises on her arms, her face

had been beaten, and she had cuts over much of her body. She had also been raped.

Early that same morning, Monique Sturm ("Sturm") maneuvered around a car parked in a turn lane. As she continued on her way home, Sturm noticed that the parked car had been driving behind her the entire distance. When Sturm turned left onto Canal Road, her car was bumped by the car behind her. Sturm stopped her car and asked the other driver if he was okay. The driver got out of his car, apologized, then forced his way into Sturm's car and stole her pocketbook. Sturm bit his finger in the struggle that ensued and ultimately escaped through the passenger side door. She called 911 and described her attacker as a white man with blue eyes, muscular, short blond hair and a heavy Long Island accent. She also described his car as an old, blue, four-door, American car. (Tr. 13006-11). Around 11:40 a.m., a public safety officer found a wallet, later identified as belonging to Sturm, on the side of Mill Road not far from where Quinn's body would later be found.

After talking with Sturm, police identified Petitioner as a suspect because he fit the physical description and drove a car that fit the description of the car that Sturm had seen. The two crimes were connected when police learned that Petitioner's car was similar to a car seen near the murder scene around 6:30 a.m. on that morning. The witness, Glenn Kazel ("Kazel"), later identified Petitioner's car as the car that he had seen near the murder scene;

however, Sturm was unable to identify the car or Petitioner in a photo lineup.

Petitioner was arrested on  on June 2, 1997, two days after the murder.  Petitioner waived his <u>Miranda</u> rights and was interrogated.  (Tr. 14121-22, 14126-34).  Petitioner had a cut on his right index finger, consistent with Sturm's statement that she bit her attacker.  Although Petitioner first denied involvement with the Sturm robbery, he ultimately confessed that he bumped Sturm's car.  Petitioner told the police that on the night before the incident, Petitioner had gone to dinner with his family around 7:30 p.m., and after dinner he went to a comedy club.  Petitioner left the comedy club around 9:30 p.m. and went to a pub where he stayed for a few hours with his friend, Phil Anderson ("Anderson") and another man, named Brett.  He dropped Anderson off and went to a keg party with Brett where he stayed for a couple of hours.  Around 5:45 a.m., Petitioner dropped off a man named Tom at a 7-Eleven convenience store and when he drove off, he hit a car.  Petitioner claimed that when he got out of his car a woman started yelling at him and attacked him with her purse.  Petitioner admitted pushing the woman back into her car and throwing her pocketbook over a fence.  He then gave police permission to take samples of his hair, blood, and saliva.

Eventually, Petitioner confessed to Quinn's murder.  Petitioner claimed that when he was driving home, he stopped on the

road to urinate and became enraged when a woman jogging past yelled at him, calling him a bum. Petitioner claimed that he became angry because people had been yelling at him and telling him what to do his entire life. Petitioner then walked towards the woman; as he did, the woman walked back into the woods while waving a long piece of metal that resembled a screwdriver. Petitioner grabbed the metal from the woman and stabbed her repeatedly. When she fell down, Petitioner raped her, and then stabbed her again. According to Petitioner's statement, he later sat on a log and cried. Petitioner then ran back to his car and drove away, throwing the weapon on the way home. Petitioner stated that when he arrived home he washed his clothes and his car and did not go to work.

Petitioner was indicted by a grand jury on June 5, 1997 for Murder in the First Degree, three counts of Murder in the Second Degree, and Robbery in the First Degree. The trial began on June 8, 1999 and lasted seventeen days. The prosecution introduced 41 witnesses and 180 exhibits, including DNA evidence that linked Petitioner to samples collected from Quinn's body. Petitioner did not call any witnesses or introduce any evidence. Petitioner was convicted of Murder in the First Degree and sentenced to death.

On May 23, 2006, Petitioner filed this action for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. Petitioner alleges two grounds: (1) that there was a <u>Faretta</u> violation because the trial court refused to permit Petitioner to represent himself and

(2) that the prosecution failed to turn over or disclose the contents of <u>Brady</u> material.

DISCUSSION

I.   <u>Federal Habeas Review of State Convictions</u>

Section 2254 provides that a habeas corpus application must be denied unless the state court's adjudication on the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).  "A state court 'adjudicates' a petitioner's federal constitutional claims 'on the merits when it (1) disposes of the claim on the merits, and (2) reduces its disposition to judgment.'"  <u>Norde v. Keane</u>, 294 F.3d 401, 410 (2d Cir. 2002) (quoting <u>Sellan v. Kuhlman</u>, 261 F.3d 303, 312 (2d Cir. 2001)).

"Clearly established federal law 'refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision.'"  <u>Howard v. Walker</u>, 406 F.3d 114, 122 (2d Cir. 2005) (quoting <u>Kennaugh v. Miller</u>, 289 F.3d 36, 42 (2d Cir. 2002)).  A decision is "contrary to" established federal law if it either "applies a rule that contradicts the governing law set forth in" a Supreme Court case, or it "confronts

7

a set of facts that are materially distinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [their] precedent." <u>Penry v. Johnson</u>, 532 U.S. 782, 792, 121 S. Ct. 1910, 150 L. Ed. 2d 9 (2001) (citing <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)). A decision is an "unreasonable application of" clearly established Supreme Court precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." <u>Id.</u> (citing <u>Williams</u>, 529 U.S. at 407-08). Accordingly, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather that application must also be unreasonable." <u>Williams</u>, 529 U.S. at 411.

II. <u>Petitioner's Claims</u>

    A.   <u>The Alleged Faretta Violation</u>

It is by now a fundamental principle that the Sixth Amendment requires that a criminal defendant -- who knowingly, voluntarily, and unequivocally waives his right to appointed counsel -- be allowed to represent himself at trial. <u>Johnstone v. Kelly</u>, 808 F.2d 214, 216 (2d Cir. 1986) (citing <u>Faretta v. California</u>, 422 U.S. 806, 835-36 (1975)). Indeed, in <u>Johnstone</u>, the court ordered that petitioner's habeas corpus petition be granted because of the state trial court's denial of petitioner's

request to represent himself at trial.

If a defendant unequivocally, voluntarily, and intelligently waives his right to counsel, "[t]he right of a defendant in a criminal case to act as his own lawyer is unqualified if invoked prior to the start of trial." Williams v. Bartlett, 44 F.3d 95, 99 (2d Cir. 1994) (quoting United States ex rel. Maldonado v. Denno, 348 F.2d 12, 15 (2d Cir. 1965)) (internal quotation marks omitted). A violation of a defendant's right to represent himself requires reversal and is not subject to the harmless error analysis. Johnstone, 808 F.2d at 218.

While it is true that "[a] defendant is not deemed to have equivocated in his desire for self-representation merely because he expresses that view in the alternative, simultaneously requests the appointment of new counsel, or uses it as a threat to obtain private counsel," Williams, 44 F.3d at 100, the right to self-representation may be waived after it is first raised, by words or by conduct that indicates that a defendant has abandoned the issue or is vacillitating on the issue. See id. Therefore, "[a] waiver may be found if it reasonably appears to the court that defendant has abandoned his initial request to represent himself." Wilson v. Walker, 204 F.3d 33, 37 (2d Cir. 2000) (quoting Brown v. Wainwright, 665 F.2d 607, 611 (5th Cir. 1982)). In addition, the court will look at the defendant's course of conduct and requests over the whole proceeding to determine if the defendant was

unequivocal in the request to proceed pro se.  See, e.g., Johnson, 808 F.2d 214.

Petitioner maintains that the trial court violated clearly established federal law by not heeding Petitioner's requests to represent himself.  Both the appellate division and the Court of Appeals rejected Petitioner's claim.  The Court of Appeals found that Petitioner's "request to represent himself was not clearly and unequivocally presented." LaValle, 817 N.E.2d at 349. The Court agrees.

On February 16, 1999, Petitioner informed Judge Mullen that his attorneys "want[ed] to attack [the] case in two different ways."  4182.  Petitioner stated that he was "not comfortable with [his] attorneys" because they were "not representing [Petitioner] in the way [Petitioner thought] they should be representing [him.]" (Tr. 4197).  Judge Mullen denied Petitioner's request for new counsel.

At a conference held on May 18, 1999, Petitioner again informed Judge Mullen that he did not fully agree with his counsels' trial strategy.  After a lengthy discussion, Petitioner told Judge Mullen, "Your Honor, if you are telling me that I have to respect and listen to my lawyers['] views on how to attack the case, I would have to disagree with you.  I would ask that you would dismiss my lawyers and if I could represent myself." (Tr. 11901).  Shortly thereafter, Petitioner reiterated his disagreement

with his counsels' trial strategy and stated, "The only thing I see and that's my last option is to represent myself, <u>not that I want to</u>, I don't know nothing about the law, but at least I have a chance to prove my innocence and not have my lawyers take the side route." (Tr. 11902) (emphasis added). It is clear from this statement that Petitioner did not unequivocally request to represent himself. Petitioner, in fact, stated that he did not want to continue <u>pro se</u>, but rather felt that he was forced to represent himself because he disagreed with his counsels' tactics.

Although "[a] request to proceed <u>pro se</u> is not equivocal merely because it is an alternative position, advanced as a fall-back to a primary request for different counsel[,]" <u>Johnstone v. Kelly</u>, 808 F.2d 214, 216 n.2 (2d Cir. 1986), here, Petitioner did not unequivocally request to represent himself after being denied new counsel. In fact, after Judge Mullen warned Petitioner that proceeding <u>pro se</u> would be "absolutely disastrous[,]" Petitioner responded, "If you are going to deny me to represent myself, maybe take into consideration appointing two new lawyers and not using no delay tactics and give me a month." (Tr. 11905).

Petitioner did not raise the issue of self-representation again during the conference. At the close of the conference, Judge Mullen said, "Here is what we will close on, [Petitioner's attorneys will] make the decisions but they will be the first to admit that they need input from you. . . . We'll break on good

terms." (Tr. 11909). To which the Petitioner simply replied, "Yes." (Tr. 11909). The record reflected that the Petitioner left the meeting with a smile on his face.

It is evident to the Court from this colloquy that Petitioner's statements did not amount to an unequivocal and intelligent request to proceed pro se. Rather, Petitioner's request was at all times for new counsel, and not to proceed pro se. "[T]he context of the reference to self-representation is important in determining whether the reference itself was a clear invocation of the right to self-representation." Morris v. Kikendall, No. 07-CV-2422, 2009 U.S. Dist. LEXIS 34287, at *31 (E.D.N.Y. Apr. 23, 2009). Here, Petitioner briefly requested permission to proceed pro se during a lengthy conversation in which Petitioner's primary goal was to receive new counsel. Petitioner requested new counsel previously, and repeated this desire throughout the May 16, 1999 conference, both before and after his brief reference to self-representation. "It was certainly reasonable for the state court in that context to view the passing reference to self-representation as simply a figurative expression of frustration or hyperbole by [P]etitioner, rather than as an unequivocal attempt to seek to represent himself as an alternative position." Morris, 2009 U.S. Dist. LEXIS 34287 at *31-32. As the Court of Appeals aptly stated,

> Defendant gave the impression that he was not
> committed to self-representation. . . .

> Initially, defendant made the conditional
> statement that if the court forced him to go
> along with the strategy of his attorneys, he
> would ask to represent himself. Defendant did
> not assertively state that he wanted to
> represent himself. Defendant then stated that
> he saw self-representation as his last option,
> though he did not want to represent himself
> because he did not know anything about the
> law. When defendant mentioned self-
> representation for the last time, he again
> couched it as a hypothetical, adding the
> request for new lawyers as an alternative.

LaValle, 817 N.E.2d at 349.

The Court rejects Petitioner's argument that the facts of this case are similar to those in Johnstone v. Kelly, 808 F.2d 214 (2d Cir. 1986). In Johnstone, the defendant repeatedly requested that he be permitted to proceed pro se after the trial court denied his request for new counsel. The trial court responded by inquiring into the defendant's "age, education, employment, and familiarity with legal proceedings" and by "repeatedly warn[ing] [defendant] of the grave risks of defending himself against serious charges." Id. at 216. In response, the defendant again requested to proceed pro se, and stated that he studied the papers in the case every night. The trial court nonetheless stated that the defendant "was 'not qualified' to represent himself because he lacked 'the requisite education, background or training or experience.'" Id. The trial judge continued, "'[defendant] is eighteen, he has scarcely any formal education so far as I can ascertain, he has no known occupation and he has virtually no

previous exposure to legal procedures, except for the first trial.'" Id. The Second Circuit found that the defendant clearly and unequivocally indicated his desire to proceed pro se, and that the trial court improperly denied this request because the court felt the defendant was not qualified to represent himself.

Unlike the defendant in Johnstone, Petitioner never unequivocally requested to represent himself. In fact, Petitioner clearly stated that he did not actually want to represent himself because he had no knowledge of the law. The trial judge did not deny Petitioner's Farretta request because he thought that Petitioner was not competent to represent himself; rather, the trial court never ruled on this issue because Petitioner did not unequivocally request to proceed pro se. Thus, this case is clearly distinguishable from Johnstone. See Morris v. Kikendall, No. 07-CV-2422, 2009 U.S. Dist. LEXIS 34287, at *29 (E.D.N.Y. Apr. 23, 2009) (finding that Petitioner did not clearly invoke the right of self-representation with his statement, "I'd rather represent myself than continue going on with [counsel] representing me.").

Even if he unequivocally communicated a desire to proceed pro se, Petitioner later abandoned this request and thus waived his right to represent himself. Petitioner did not again raise the issue of self-representation at any point after the May 18, 1999 conference. Moreover, after the trial court relieved Gottlieb, Petitioner communicated a desire to proceed to trial with his

14

remaining counsel.

The trial court specifically revisited the issue of Petitioner's representation at a conference held on May 24, 1999. At that conference, Judge Mullen informed Petitioner that he "want[ed] some input from [Petitioner] in open court on the record as to where we are going" with respect to Petitioner's representation. (Tr. 12459-60). Petitioner responded that he was "ready to proceed on the trial with [his] lawyer Martin Efman." (Tr. 12461). However, Petitioner indicated that he could not continue with Gottlieb. Petitioner elaborated, "Me and Mr. Efman are willing to go to trial the way I would like to go to trial. . . . . I'm ready to go. I can't have Mr. Gottlieb . . . represent me the way he wants to represent me" (Tr. 12462). When asked if there was anything else Petitioner wanted to say, Petitioner responded, "No, I'm just . . . thank you." (Tr. 12463). Later in the conference, Effman, Petitioner's remaining counsel, requested that the trial court postpone jury selection until the court determined whether to appoint new counsel. The trial court asked Petitioner if that was also his desire; Petitioner responded, "I agree with everything my attorney just said, your Honor." (Tr. 12479). Thereafter, the trial judge relieved Gottlieb and appointed a new associate counsel. Petitioner did not again raise his dissatisfaction with his attorneys, nor did he indicate a desire to represent himself.

"[T]he right to self-representation may be waived through conduct indicating that one is vacillating on the issue or has abandoned one's request altogether." Williams v. Bartlett, 44 F.3d 95, 100 (2d Cir. 1994). Here, Petitioner abandoned his request by failing to raise the issue of self-representation again, particularly in light of the fact that a conference was held specifically on the issue of Petitioner's representation. Additionally, Petitioner cooperated with Efman and his new counsel and failed to voice dissatisfaction with his remaining counsel. The Court finds that Petitioner's actions indicate that he abandoned his earlier request to represent himself. See Wilson v. Walker, 204 F.3d 33, 39 (2d Cir. 2000) (finding that petitioner "reasonably appear[ed]" to have abandoned his request to represent himself by his "apparent cooperation with [his new counsel], his failure at any point after Bennett's withdrawal from the case to voice any dissatisfaction with his representation, and his decision not to reassert his previously asserted right to represent himself.") (internal quotation marks and citations omitted); Davis v. Kelly, No. 97-CV-1653, 2000 U.S. Dist. LEXIS 10959, at *56 (S.D.N.Y. Aug. 2, 2000) ("Even assuming that [Petitioner] clearly communicated his desire to proceed pro se to the trial court, he waived his right to self-representation through abandonment, as he made a motion for a co-counsel at the last pretrial hearing prior to the second trial.") (adopted by Davis v. Kelly, 2000 U.S. Dist.

16

LEXIS 17292 (S.D.N.Y. Nov. 29, 2000)).

For the reasons stated above, the Court finds that the Court of Appeals did not act contrary to, or unreasonably apply, clearly established federal law in rejecting Petitioner's claim that the trial court violated his Sixth Amendment right to self-representation.

B.    The Alleged Brady Violation

Approximately two months after jury selection, the police obtained statements from two of Petitioner's friends, John Doe and Richard Roe, indicating that Petitioner had been drinking, and perhaps smoking crack, on the night before Quinn's murder.  On June 2, 1999, the prosecutor informed Petitioner's counsel of the existence of these statements.  When defense counsel requested these statements, the trial court asked the prosecution to submit the statements for an in camera review.  The trial court ultimately issued a decision denying Petitioner's request on the grounds that Petitioner already knew the content of the statements and was aware that Doe and Roe had provided the statements.  Petitioner now argues that the trial court violated Petitioner's Brady rights by failing to require disclosure of the alleged exculpatory evidence.

In order to constitute a Brady violation, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State either willfully or inadvertently; and

17

prejudice must have ensued." Strickler v. Green, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). "The question is not whether the defendant would more likely than not have received a different verdict with the suppressed evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. at 290.

The Court finds that the Court of Appeals did not err in finding that there was no Brady violation during Petitioner's trial. The statements by Doe and Roe "contained some measure of favorable evidence[;]" however, as the Court of Appeals correctly found, "they were not suppressed by the prosecution and . . . ., accordingly, there was no Brady violation in this case." LaValle, 3 N.Y.3d at 110. "Evidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence.' United States v. Zackson, 6 F.3d 911, 918 (2d Cir. 1993) (internal quotations and citations omitted). Here, Petitioner knew the identity of the individuals who gave the statements, and knew, or should have known, that he had been drinking and/or smoking crack.

Petitioner relies on Leka v. Portuondo, 257 F.3d 89 (2d Cir 2001), in support of his arguments; however, Leka is clearly distinguishable from this case. In Leka, the prosecution stated early in the case that a police officer had witnessed the shooting and could identify the defendant. On the eve of trial, the

prosecution revealed the officer's name.  The prosecution then told the defendant that the officer would not testify, but did not provide defendant with any further information regarding the substance of the officer's knowledge.  Additionally, the prosecution sought a court order from the trial court denying access to the officer on the grounds that the defense utilized deceitful methods to contact the officer.  The trial court granted this request, making it difficult for the defendant to access the officer.

The Second Circuit found that the prosecution's revelation of the officer's name did not satisfy its <u>Brady</u> requirements because "[w]hen such a disclosure is first made on the eve of trial, or when trial is under way, the opportunity to use it may be impaired.  The defense may be unable to divert resources from other initiatives and obligations that are or may seem more pressing.  And the defense may be unable to assimilate the information into its case."  <u>Id.</u> at 101.

Unlike the defendant in <u>Leka</u>, Petitioner knew, or should have known, of the substance of his friends' statements.  Moreover, Petitioner had approximately a week before the trial started to subpoena these individuals.  Thus, unlike Leka, Defendant was not provided with too little information too late.  "The purpose of the Brady rule is not to provide a defendant with a complete disclosure of all evidence in the government's file which might conceivably

assist him in preparation of his defense, but to assure that he will not be denied access to exculpatory evidence known to the government but unknown to him." <u>United States v. Ruggiero</u>, 472 F.2d 599, 604 (2d Cir. 1973). Here, Petitioner "was on notice of the essential facts required to enable him to take advantage of such exculpatory testimony as [Doe and Roe] might furnish." <u>Id.</u>

In sum, the Court finds that the Court of Appeals did not err in finding that Petitioner's <u>Brady</u> rights were not violated.

III. <u>Certificate of Appealability</u>

To obtain a Certificate of Appealability, Petitioner must a demonstrate "that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." <u>Drake v. Portuondo</u>, 321 F.3d 338, 344 (2d Cir. 2003) (internal quotation marks and citations omitted). The Court finds that reasonable jurists would not differ on any of the issues presented in this habeas petition with the exception of Petitioner's claim that the trial court violated Petitioner's Sixth Amendment right to represent himself.

CONCLUSION

For the reasons stated above, the Court DENIES Petitioner's writ of habeas corpus in its entirety. The Court GRANTS a certificate of appealability solely on the issue of whether the trial court infringed Petitioner's Sixth Amendment

right to represent himself.  The Clerk of the Court is directed to mark this matter as closed.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J

Dated:    Central Islip, New York
          November  5 , 2009